We have one case this morning that was a, we call it a one-off, but it's an urgent matter that's been brought before us. Gilliam v. United States Department of Agriculture, and it's number 20-3152, Mr. Handel and Mr. Sammons. Good morning, your honors. May it please the court, Josh Handel for the US Department of Agriculture. With the court's permission, I'd like to reserve four minutes for rebuttal. Not a problem at all. Go right ahead. Thank you, Judge Ambrose. Last March, as broad segments of the national economy were shutting down at the outside of the pandemic, Congress enacted Section 2302 of the Families First Act to provide, quote, additional SNAP flexibility in a public health emergency, end quote. We're very familiar with the facts here, so let me ask you, just so we lay the groundwork. If you have a household, and let's say the maximum monthly allotment would be 100, and that household was getting 100, and then with the second COVID relief bill a couple weeks ago, I guess it would now be 115, is that right? So, yes, except that the Secretary also re-evaluated the cost of the Thrifty Food Plan in June to increase it by about 5%. So, a household that at the beginning of the pandemic was getting 100 would get 105 after that, and then would get a 15% increase on that, so it would be about 120. Yeah, 15 of 105 would be about 121, 122, something. Right. Now, if a family was getting before its allotment was 50 instead of 105, and it would get 15% more, would the family get 15% of 50 more, or whatever the number is, or would it be 15% of what is now 120, because of what happened in June? So, Judge Ambrose, my understanding is that, and I assume we're talking under USDA's guidance, correct, not under the preliminary injunction, right? Yes, sir. So, pursuant to USDA's guidance, all households during dependency of this public health emergency are being raised up to the maximum monthly allotment, so that household that was getting 50 at the very outset of the pandemic would be raised up to the 121 or whatever we settled on, the 5% plus 15%. Okay, that was, in effect, that was a digression question, because I was just running it by my own head. What I seem to think, making this as simple as I can for myself, that the plaintiffs are saying that there is a usual allotment, which could be 105, or now 121, and that there is an emergency allotment. They're separate. And you're saying, no, no, we've been telling you from the get-go, there's only one, it's 121. That's the max you can get. That is correct, Judge Ambrose. We believe that because Congress has not revisited the Thrifty Food Plan, which, you know, except for the 15% increase in the Consolidated Appropriations Act passed last month, Congress had not revisited the Thrifty Food Plan amount. And because the Thrifty Food Plan amount, by statutory definition, establishes the constraint on a household's presumed food needs under this program. Yes, we believe that that establishes the ceiling on SNAP allotments to all households. Okay, thank you. Sure. You know, it seems so likely that Congress had in mind such a thing as 14638. Judge Krause, one thing, there's a lot of buzz when you're talking. I don't know what's going on. You just won't try to get through it because it's difficult to understand. Yeah. Sorry. This is the background, I'm sorry. Is that any better? Is that any better? A little bit. If you keep your voice up, it's good. Okay. So, it looks like Congress was patterning the sections that we're dealing with here on the section 2014H3 data. And both of these are the same terminology, but they're also the same structure. There's this idea of providing for emergency allotments in the first paragraph, and then the eligibility and reporting in the next paragraph. So, the meaning of 2014H3A is on particular significance. And I'd like to understand the position there, because on the one hand, you seem to be trying to distinguish it as very different. On the other hand, you seem to be arguing that it actually is consistent with and supports your position. So, which one is it? Right. So, thank you, Judge Krause. I think there are a couple of separate elements of Section 2014H3A and the various disaster provisions that are relevant here. So, on the one hand, yes, Congress did use the term emergency allotments in that provision as referring to a very kind of unique scenario with respect to something that can happen during natural disasters, which is the spoliation of previously purchased food through probably most commonly the loss of power leading to loss of refrigeration. As we pointed out in our reply brief, we think that that particular context is in a posit here, because obviously COVID-19 does not cause the spoliation of previously purchased food. We think that if there is any commonality to read between the use of the term emergency allotments in Section 2014 and the use in the Families First Act, the most that can be read into that term is simply allotments beyond a SNAP household's regular monthly allotment that are dispersed in exigent circumstances. And that doesn't really get you anywhere in terms of differentiating between plaintiff's reading of the Families First Act and USDA's reading. I'm sorry. To replace food that is lost, there would have to be an additional cash outlet for that household, right? So that's correct, Your Honor. But I think kind of taking a broader view of things, the existence of these food spoliation emergency allotments do not demonstrate Congress's intent to go beyond the Thrifty Food Plan in terms of its assessment of general household food needs, even in emergency circumstances. So under Section 2014 H3A, a household that already received the maximum monthly allotment and then receives this kind of one-off payout to replace spoiled food ends up with a monetary value of food that is still less than or equal to the statutory cap on SNAP benefits. So it's kind of a niche retrospective benefit that we would argue conveys no change in Congress's assessment of food costs or availability or the robustness of local food banks or any of the kind of broad food supply-related difficulties that plaintiffs have asserted as informing the definition of temporary food needs under Section 2302A1 of the Families First Act. So, again, I'm sorry. It does mean that Congress and USDA were understanding that these provisions were to authorize an increased cash outlay. Given the particular fact of the household's circumstances, the amount of food that they needed, why shouldn't we think of that same framework applying for the individualized temporary food needs of a household? On a case-by-case, receipt-by-receipt basis, we didn't know much about what was being authorized. We didn't know much about the pandemic-related temporary food needs here. I think that you are in the food spoliation context. You are talking about Congress continuing to cling to this idea of the thrifty food plan as the amount that is necessary to feed a family of four with adjustments for household size for one month. And then under Section 2014H3A, they're making a one-time adjustment that is solely retrospective and it is solely intended to remediate the loss of food previously purchased with a household's SNAP allotment that was spoiled from the loss of refrigeration during a disaster. But it does not encompass any of the sorts of additional factors that plaintiffs have posited here. It does not change Congress's assessment of the sufficiency of the thrifty food plan going forward. It certainly does not encompass any of the locality-specific food price increases or loss of food banks or other charitable resources that would be necessary in order to accommodate a plaintiff's meeting. Could I ask, if you could, you hit on this consideration of things like cost, availability of food banks, et cetera. How does that interact with 2302A2, which allows flexibility in terms of application reporting and issuance? Is the issue of issuance, and issuance is like how you go about giving out the benefit. Application is am I eligible for it? When the USDA is considering eligibility as a general matter and then under this flexibility of what they can consider, are they ever considering anything other than income and household numbers in the household? Put differently, are they ever considering and setting someone's eligibility for benefits, the kinds of things the plaintiffs have brought to our attention like food costs and other resources to gain food from charitable entities? No, Judge Schwartz. So this is a very important point. SNAP, in general, operates on a two-input, one-output model. There are, as you said, just two inputs to the benefit entitlement formula. There's household size and household income. And there is one output, which is whatever benefit it takes to bring that household up to affording the Thrifty Food Plan calibrated for its household size, less 30% of net household income. So things like, you know, the availability of a local food bank or something like that, that is entirely unrelated to the definition of the Thrifty Food Plan. It is not something that USDA ever takes into account when it determines the sufficiency of benefits under the Thrifty Food Plan. I'm sorry, go ahead. Understanding that proposition, what can that do to inform us of how to read this statute? Right. So, well, I mean, I think it's essentially dispositive of this statute. So, you know, obviously USDA reads this statute as operating within kind of the general statutory and programmatic framework that underlies the SNAP program, which, again, operates just on kind of toggling those two inputs, household size and household income. Plaintiffs have asserted that Section 2302A1 creates a freestanding benefit that is totally tethered to the pandemic and untethered from any conception of the Thrifty Food Plan or pre-existing definitions of household food needs. And I think there are two very strong reasons not to embrace plaintiff's reading of this as kind of the standalone benefit that they envision. The first is what we were just kind of discussing, which is that plaintiff's reading would introduce this kind of real-world hyper-localized differentiation in benefit entitlement based on factors like food prices, cost of living, the availability of food banks, etc. That would be directly contrary to a bedrock principle of the SNAP program as Congress defined it, which is nationwide uniformity of benefit entitlement. As it stands today, under Congress's design for better or for worse, a household in Manhattan, Kansas, receives the same SNAP benefit as a household of the same size and income in Manhattan, New York, notwithstanding what we understand are pronounced real-world differences in food prices and various charitable resources, food availability, etc., between those localities. So I think if Congress were going to do an about-face on that point, if it were going to consider for the first time localized variations in food prices and consider for the first time localized variations in outside charitable resources, we would expect Congress to have said so unmistakably. And whatever else you can say about the legislative draftsmanship here, it was not unmistakable that that was Congress's intent. And is that your basis by saying it's not unmistakable means the district court erred when it said the statute was unambiguous and therefore the preliminary injunction shouldn't have been granted? Well, I certainly think that, yes, that is one ground for error in the district court's decision. I think it also just, you know, the district court and courts in general have a duty that's been recognized by this court and the Supreme Court to situate statutory provisions within the broader statutory and regulatory scheme. Right. And I think that treating this emergency allotment, these temporary food needs, as completely untethered from the Thrifty Food Plan, which is in many ways the North Star of the SNAP program, is just not faithful to the broader context of the SNAP program as Congress has designed it. How do you get around the district court's observation that there was, and I think this is roughly its words, no evidence that Congress was informed of what it would cost to be able to fund these estimates that the USDA provided, at least to the staffers? The district court seems to suggest that the appropriation, because what caused me to ask that is, you said, you've got to look how we're situated. And one could argue, since the appropriation bill was like 10 days later, it was situated at least with some informativeness from the appropriation. But the district court said there's no evidence Congress even knew about the estimate. What do we do with that? Do you want us to consider the appropriation? Should we not consider the appropriation? What do you think? Sure, I would love you to consider the appropriation, because I think the appropriation is at a level commensurate with USDA's understanding of the program and wildly inadequate to cover the potential outlays that would be engendered by plaintiff's reading. But I think even without considering any of the evidence that we've adduced about communications between USDA and OMB and congressional staff and things like that, you can just look at the statutory language. And I think plaintiffs acknowledge that what Congress was doing under their reading was creating essentially a clone SNAP program, right? Congress was creating an entirely new benefit that is up to the massive outlays that previously attached to regular SNAP payments. And I think our position is if Congress were going to essentially double SNAP's financial exposure by creating this new standalone benefit that can singularly be up to the same amount as the maximum monthly allotment under regular SNAP benefits, it would have spoken clearly and it would have appropriated an amount consistent with that outcome. And neither of those factors is met here. And let me just ask you one other thing. The guidance, you argue Chevron deference. Am I right about that in your brief? That's correct. Yes. Now, the pages that attach the little form that goes to the state says explicitly this does not have the force of law. So how can you tether yourself to Chevron deference with that express position of the USDA in the same document where this guidance appears? Sure. So the guidance is it doesn't have the force of law and it is not binding on the general public, right? This was not a situation where USDA was engaged in a rulemaking that binds members of the general public or anything like that. But this is still clearly applying this law to regulated entities under USDA's purview. And we know that because USDA effectuated this guidance by adversely adjudicating Pennsylvania's and other states requests for funding. And I think that's kind of the distinction here. Yes, absolutely. I acknowledge, you know, you and I just walking along the street are not in any way bound by this particular guidance statement by USDA. But when Pennsylvania submits a request for emergency allotments under Section 2302A1 of the Families First Act and USDA says either, yes, you get this money, we're authorizing it, take it out of our account or no, we are rejecting your request and here's why. The here's why pointing to the guidance gives it the force of law with respect to the state administering agency. Thank you. Let me pick up on that, if I can. We have a case from 2012 called Hagans, H-A-G-A-N-S at 694 F3rd 287. It talks about various factors that you look to to determine if there is to be given Chevron deference. One, to pick up on Judge Schwartz's point, the lack of legal effect of the ruling. It's very clear on the cover pages here. This has zero legal effect. The lack of notice and comment rulemaking. There's none here. Whether there's care in crafting the guidance that was done very quickly within two days and they just kept following up on it on the subsequent pronouncements. And the failure to explain how or why the agency reached the interpretation. And it looks like the interpretation here is particularly conclusive. So when you look at all those things, why in the world would you consider Chevron deference when, just look at it for under Skidmore deference, whatever persuasive effect it may have. And your argument, you fall back to the argument, okay, well we had some type of adjudication, but it wasn't an individual adjudication. It simply applied a previously adopted and formal guidance in a summary way. I suspect if we said that what you get is Chevron deference, this would be leading with our chin to the Supreme Court. Well, Judge Ambrose, I think, so I guess a couple of points on that. Certainly, you are correct. There are various kind of factors that Hagan's laid out that are not met here. This was not promulgated through notice and comment rulemaking. It is not binding on the general public. There is still, I would argue, legal effect to this guidance because it deprived the applicant states of legal authorization to take federal funds and distribute those to its citizens. So I do, I would argue that this guidance, you know, or USDA's interpretation as effectuated through its informal adjudication, the state request, carries the force of law with respect to those regulated entities. But I understand that Chevron is, you know, perhaps it's a tough sell here. Obviously, the Ninth Circuit in Hall was not persuaded that Chevron deference should apply there in large part because of the sequence of how USDA laid out this interpretation, how it articulated it in an informal guidance before effectuating it in an adjudication. But I think even if you're not persuaded that Chevron applies, the idea that there is statutory ambiguity here does work in USDA's favor. If you conclude that the language of Section 2302 is ambiguous, such that Chevron might apply if this guidance had been promulgated through a more formal process, then at a minimum, that same ambiguity should have precluded plaintiffs from carrying what this court has described as its heavy, as their heavy burden of justifying a mandatory injunction that would disturb the status quo. And then, as Judge Ambrose, you mentioned, Skidmore deference certainly applies here. And plaintiffs did not contest in their brief our arguments that USDA's interpretation is entitled to substantial weight under the Hagan's sliding scale test and the factors that Hagan laid out specifically with respect to Skidmore deference. So even if you don't think that USDA's interpretation of the statute is controlling under Chevron, at the very least, it's compelling under Skidmore because it is a reasonable reading of the statutory language. It was issued contemporaneously with enactment of this statute, and it reflects a consistent approach to addressing household food needs in exigent circumstances. I think I'm well over my time. With this panel, it's always the case. Do my colleagues have any further questions before we get you your opponent and then get you back on the boat? It also provided that that would only apply if the value of the benefits would be greater under that calculation than the absence of this process. How can we understand that? And what implications does that have for the current defense contention? I'm sorry, Judge Gross, I might have missed some of your question there. I think you were talking about the section of the Consolidated Appropriations Act that provides the 15% across the board. Is that correct? Yes, it was. But specifically, the provision that goes on to say that that only applies if the value of the benefits would be greater under that calculation than in the absence of this subsection. And whether that signals Congress's recognition and acceptance of the idea that households should be receiving more than 100%, perhaps because of 2302A1. Your Honor, I think there's very little textual or legislative history evidence to suggest that that's what's going on here. I think that even if, let's take Pennsylvania, for instance. Pennsylvania has now benefited from the existence of the preliminary injunction for the last four months. The state has submitted requests for an extra 50% of the Thrifty Food Plan amount. We anticipate that going forward, Pennsylvania will be requesting that extra 50% based on the stepped up 15% basis that we are now directed to apply to the Thrifty Food Plan by Section 702 of this Act. I don't think there's really any group of SNAP beneficiaries that would fall into that category, at least because of emergency allotments. There may be other SNAP programs floating out there that would apply in this way that I'm not aware of. But certainly, it would not apply to any of the Pennsylvania households that are currently benefiting from the preliminary injunction. And so I think it's limited to no instructive value in terms of kind of inferring what Congress was trying to communicate with respect to the scope of Section 2302A1 of the Families First Act. Actually, I have a couple more questions, if I could. The first is, there was submitted Ms. Shaheen's affidavit. What's the reasoning for why we should accept that into our consideration on a field? Your Honor, I'm sorry. I think there were a few affidavits supported. I'm looking at the one of Jessica Shaheen. I'm looking primarily at that one. Okay. And this one concerns the sort of budgetary implications of, you know, Pennsylvania's reading of the statute and things like that. I guess, sorry, I'm just trying to hone in on what exactly it is. It's a three-page affidavit with 16 paragraphs, giving an understanding of what the USDA understands to be a normal allotment for the regular SNAP program, and compared it with similarities to the disaster-related expenses that they previously have done, things like that. Basically, it's trying to support or make more solid the position of the USDA in this case. Sure. So, I think, you know, this is also evidence that was submitted in the summary judgment proceedings in the district court. It's part of the record. It's appropriate to consider it on appellate review. I think it, you know, it explains how USDA has approached this program in the past, and USDA's understanding of what Congress was doing in this statute. Obviously, if you think that the statutory text here is entirely clear without any reference to past practice by the agency or anything like that, then you're free to disagree. It's hard for me to say that this statutory text is entirely clear. There wouldn't be such good people making good arguments on both sides. Yes, I tend to agree with you that this is, you know, perhaps not the platonic ideal of clarity in legislative draftsmanship, but I think that, you know, the primary purpose for which we submitted the affidavit was on the equitable side of things with respect to the budgetary pressures that USDA is facing and the possibility of, you know, potentially having to reduce benefits in the event that we are enjoined to... Well, Judge Ambrose, I think certainly USDA is in a better position now than it was under the continuing resolution, which was essentially asking USDA to support a bunch of new programs and new burdens under the same sort of shoestring budget that had applied before the pandemic. But even under the new increased appropriation, maintaining Pennsylvania's privileged position will deplete the funding that Congress has appropriated for this program. The PI, as we pointed out in our most recent 28J, the PI was issued less than four months ago. It's already cost almost half a billion dollars, I think $428 million or so. The funding that Congress appropriated for necessary expenses to carry out the Food and Nutrition Act has to cover not only regular SNAP allotments at the new 5% increased thrifty food plan amount, but also the other increased costs that were discussed in the press release that we cited on page 20 of our opening brief and page 8 of our reply. That includes the large increase in enrollment that SNAP has experienced. It includes the continuation of emergency allotments for as long as the declared public health emergency persists, and it includes billions of dollars in food and administrative resources that USDA has been providing to food banks. So I think USDA is still under fiscal pressure here. Granted, I don't want to get out over my skis because we haven't submitted a new declaration in this court, certainly, with respect to the budgetary implications of the Consolidated Appropriations Act. I think the agency is still trying to kind of digest that and to understand what Congress expects of it with respect to this new appropriation. But obviously the government's primary focus here on the four-prong test for a preliminary injunction is whether there is a reasonable likelihood of success. Isn't that correct? That's correct, Your Honor, and that is the same basis on which the Ninth Circuit found in our favor in Hall last week. All right. Thank you. Any further questions from my colleagues? No, thank you. Thank you. Thank you very much. We'll get you back in rebuttal. Thank you. Mr. Sammons. Good morning, and thank you, Your Honors. Can you hear me okay? Yes, sir. Excellent. I'm David Sammons on behalf of plaintiffs' appellees. If it pleases the Court, I'd like to make a couple of points that aren't directly tied to the likelihood of success on the merits and then return to the likelihood of success on the merits and pick it up there. Before you get to that, and I'll give you a full opportunity to do that, my understanding is that Pennsylvania has not yet dispersed the funds in question. So if that's the case, do plaintiffs have standing given that the relief requested has been issued and their injury still hasn't been redressed? Yes, the plaintiffs definitely have standing, Your Honor. The District Court walked through the standing analysis, we think, accurately and appropriately. The Ninth Circuit even, although it disagreed with us on the statute, found that they were standing there. And here, in this case, we have far more evidence of redressability than was the case in the Ninth Circuit. We have half a dozen or more requests and statements from state officials, from the governor, making clear that the state intends to and will disperse these funds to all SNAP households, including those that are the poorest, if we prevail in this litigation and the USDA is enjoined from imposing its erroneous construction of the statute. We think that more than satisfies the requirements for Article III standing and for redressability in connection with the preliminary injunction. There is no reason to think, if this court agrees with us and affirms the District Court that the best reading of the statute is that all SNAP households are eligible to benefit from these emergency allotments, that these funds will be dispersed by the state. We have repeated statements to that effect from state officials. So we think that does satisfy Article III, Your Honor. Okay. And one other preliminary question before you get into the main parts of your themes. The question I had asked Mr. Kendall's, or Handel's, is that if you are currently, prior to the COVID relief bill a couple weeks ago, if you were getting $105, $105 as your maximum monthly allotment, and now the maximum has been put up to $121, are you saying that you can double that, or is it really more nuanced than that? I'm sorry. No, you go ahead. It's certainly more nuanced in this sense that we think it is clear from this text that what Congress is doing in providing this emergency benefit, this emergency allotment, it is directing that it be in addition to the normal allotment, and that it is driven not by the factors that go into the Thrifty Food Plan, but it's driven by an actual showing of data on a state-by-state basis of the real-world effects of the pandemic in each state's area. And therefore, it will vary from state to state. That is the point of it. I heard my colleague on the other side complain about our position to the effect that we are interpreting the statute to turn on real-world localized concerns. That's not a bug in our position. That is, in fact, the feature that Congress directed for these. It will vary depending on the actual data that a state has in terms of its real-world impacts, and that may change over time from month to month. They have to renew these applications. But the maximum amount that it's capped at is the amount of the monthly allotment under the Thrifty Food Plan, so it can't exceed that. But that has now been increased by Congress in the most recent legislation, and that increase would apply both to the amount of the normal allotment and then for the cap that's now referenced, the limit that's referenced in 2302. So if somebody under the normal allotment was getting now, today, 121, under the emergency allotment, they could be eligible for up to 121, another 121? That would be within the statutory limit. It would then depend on the actual showing of need that the state could provide. Here, no state has – I think this is important to keep in mind. As far as we are aware, no state has asked for the statutory maximum for this emergency allotment. Pennsylvania has asked for half of it, and it's provided data to provide it, and the government has determined that that data is adequate, and I think that's really important. And this gets to one of the things I wanted to hit in terms of the other factors for a preliminary injunction. You just kind of get those out of the way. The USDA concedes that the poorest SNAP recipients have experienced significant increased food costs as a result of the pandemic, food costs and food needs as a result of the pandemic, and that Pennsylvania has adequately showed that with sufficient data. So, putting aside the merits for just a moment, there's no meaningful dispute that plaintiffs are irreparably harmed by the denial of these emergency allotments and that the balance of equities and public interest strongly supports the preliminary injunction to address these increased food needs of these poorest households. I think the point, and I think I would agree with Mr. Handel, that this case rises or falls, and the Ninth Circuit said the same thing in Hall on the first item of the preliminary injunction factors, that is, is there a reasonable likelihood of success? Yes, I think that's right, and I think that's because, among other reasons, we satisfy those other criteria here very clearly in terms of public interest and irreparable harm, and they're not really meaningfully disputed on appeal. That was the main point I wanted to make there. So, turning to the likelihood of success on the merits, the plain terms and structure of 2302 make clear that Congress did not exclude the poorest SNAP households from emergency allotments. It did not intend that the limit is set for this new emergency benefit. It didn't intend for it to cap the combined amount of the normal and emergency benefits. It is only a limit on the new emergency benefit. Your argument, counsel, really requires us to conclude this is a new additional benefit, but then aren't you asking us to ignore the fact it's enacted within the whole concept of the Thrifty Food Plan and Congress's determination of what a particular household of a particular income or lack of income level would need to satisfy their food needs? I think you're asking us to ignore the context in which Congress enacts its SNAP benefits. How do we ignore that? With respect, Your Honor, I'm asking you to take all of the context into account and also focus on the actual language of the statute as well. Okay, let's do that. Let's look at the statute together. And you now have the Ninth Circuit using a particular canon of construction saying temporary food needs to be cut down. And the thing that follows it is the modifier. And that, from its point of view, introduces an interpretation that differs from yours. Hence, there's ambiguity. I promise I'll let you finish. And if there's ambiguity in the statute, the condition under which the district court entered the preliminary injunction would be erroneous. How do you overcome that? Because remember, we're in preliminary injunction land and determining a likelihood of success predicated from the district court's part on unambiguity. And here you have a circuit court providing a mechanism to see how it is ambiguous. How do we find that's erroneous? Well, the place I would first refer you to, Your Honor, is to Chief Judge Thomas's dissent in the Hall case that I think masterfully walks through and shows why each of the reasons that the majority gave for that construction are, in fact, erroneous and do not support a plausible or appropriate interpretation of the statute. So that's the first place I would look. And I would just push back a bit, Your Honor, that the standard for a preliminary injunction here, even if the court were to find—now, we think the statute is clear. Let me be absolutely certain about that. We think the statute is clear. And even if there is certain ambiguity in different aspects of the act, we think the government's construction is impermissible as a matter of law, that any ambiguity you might find would not support the interpretation that they've adopted here. So that would entitle us to a preliminary injunction, even if you think that it's possible to reach different interpretations. But let me try to persuade you as to why that's not the case here. Before you do that, I just want to ask, we have to overcome the fact that—let's assume there's ambiguity. As a result, the district court made a legal error. How can we affirm? Well, I think that turns to the standards that are incumbent upon a party to obtain a preliminary injunction. And I think you could affirm on the ground that, one, it's a flexible standard. So even if you have some doubts as to likelihood of success, if you don't think the likelihood of success is as strong, say, as we posit, that doesn't mean you have to throw the preliminary injunction out. Stay with me. I'm familiar with the sliding scale. I want to just stay with me on prong one, if you could. If the district court made a legal error in concluding a lack of ambiguity, because that's what they said, it's unambiguous, you win. If that condition was mistaken, that first element, mistaken, how do we find there was a likelihood of success on the merits? I want us to adopt Judge Tom's opinion, and I understand that. And that's similar to the district court. But let's assume we think it's ambiguous. How can we still have you prevail on prong one? Again, I'm afraid if we're kind of going back here and forth here, I apologize. I think it's because the statute is clear enough, I think, that the government's interpretation is not permissible. And so if that's the case, if the statute forecloses the government's interpretation, then obviously you can affirm the preliminary injunction. And even if you think there is some aspect of ambiguity, we do not think it would support the government's interpretation. And in any event, the other factors for a preliminary injunction are satisfied. And I think it is within this court's authority and discretion to affirm, even if there's ambiguity, based on your reading of the statute. I think it is incumbent upon this court, and we would urge this court, to provide what is your best reading of the statute in the context of this preliminary injunction determination. Let me ask another question. Let's assume your reading is the reading. How do we reconcile it with the appropriation that was put forth just days after the statute was enacted? Put aside whether the Congress was aware of the USDA's estimate. We have a dollar amount. How do we reconcile that appropriation with your reading? I think that's actually quite easy, Your Honor, because every court that's looked at this has concluded that that appropriation is not a valid ground for interpreting the statute. What did the Ninth Circuit do? The Ninth Circuit just didn't rely on it, right? The Ninth Circuit panel majority did not discuss it, and Chief Judge Thomas, in his dissent, points that out and says, for very good reason, because there's absolutely no authority for relying on that. There's no case law that says you can look at an appropriation to inform interpretation of the statute? I don't think, not in this context, no, and certainly not when you have a pattern of Congress adding additional appropriations. Judge Schwartz, one of the main problems with that approach is it freezes in time the idea that Congress was appropriating, once and for all, all funds for the SNAP program here. We know by what just happened that Congress just provided a substantial, a very large and enormous amount of additional funds that are available for all of the SNAP programs, including the emergency allotments that are at issue here. There's no reason to think Congress would not continue to do so if the outlays are actually exceed those appropriated amounts. With respect, I do not think it is a valid approach to statutory construction to say that when Congress appropriated funds, even though we have no basis to conclude they were even aware of the USDA's calculations or anything else, there's certainly no reference to that in the text, there's no reference to it in legislative history. When you have statutory language that we submit is clear, of course you're bound by that, but I just think that that appropriation is not a basis for construing the statutory text here. Let me turn now to the text and try to highlight what I think is... The latest COVID-19 relief legislation of a couple weeks ago included an across-the-board 15% increase in SNAP benefits. I'm not asking you to look at legislative history, but look at post-enactment legislation itself. It seems that Congress understood that, okay, we're going to take this up by 15%. Under the example we have, 105 becomes like 121. But wouldn't it be entirely superficial if Section 2302 of the Families First Act already allowed SNAP benefits to get up to double benefits? No, not at all, Your Honor. In fact, I think this is a really critical point, and I think it's illustrative of where the government gets the statute wrong, in our view. Congress has provided for the normal monthly allotment and has now increased the normal monthly allotment. That functions in a different way than the emergency allotment. The normal allotment following the Thrifty Food Plan is a nationwide, across-the-board amount of money available to families. It doesn't vary from state to state. You cannot read, with respect to my colleague on the other side, you cannot read this statute as mandating an across-the-board national emergency amount. It is to be driven, it is expressly to be driven by the actual data each state can provide and based on the request that each state makes. This is a benefit that is designed to address the very state-specific COVID-related increased temporary food needs that come under the pandemic. And it is not intended to be a benefit that's across-the-board. That remains true even after Congress has increased the Thrifty Food Plan allotment. That provides the basis, the baseline now, and that sets the statutory cap, but the functioning of the emergency allotment is still in place, and the Secretary is still mandated to provide an emergency allotment whenever a state comes forward with adequate data to support the request. Let me follow up on that then. You have, in March, you have an enactment, and then there are, two days later, guidance letter, and a few weeks later, two more guidance letters. And basically they say that the max you can get is X. You can't get anything more than that. You can get up to the max, but you can't go beyond it. Eight months later, December of 2020, Congress enacts another COVID relief bill, and it doesn't say that the normal maximum is different from the emergency allotment, knowing full well how USDA has interpreted this. So, it would seem that that would support the USDA's position. Otherwise, Congress could say, no, no, we mean to tell you that there's a normal monthly allotment that's a maximum, and then there is a temporary needs emergency allotment up to the maximum. Congress didn't do that. Congress did do that, Your Honor, and that's the point I would like to make. And let me emphasize two aspects in which we think it is clear that that is what Congress did. Congress provided an additional benefit that is permitted to go above the normal monthly allotment, but not to exceed for the limit on the new benefit is the same as the normal monthly allotment. But the fundamental question of the statute in the Ninth Circuit, even the Ninth Circuit majority, recognized this. All of the back and forth about the last antecedent or the nearest reasonable referent rule does not answer the statutory question under the government's reading. Now, it does under ours, because let me just make this point quickly. We think it is passing strange to think of Congress here as imposing a statutory limit on the temporary food needs a family can experience during COVID. What Congress is imposing a limit on. I think what Congress is doing is they're upping by 15% the maximum monthly allotment for households, right? In the new appropriation, I'm talking about the text of 2302, Your Honor. And in that Congress set the statutory maximum for the new benefit at the same amount as for the monthly allotment, but it is still just a limit on the new benefit. It's not a limit on the combined amount of the ordinary and new emergency benefits. And I think that's the fundamental statutory question. And I think there are a couple of points that are important to make there. First, the government can only get into that space by saying that the modifier of the limit is the temporary food needs, not the emergency allotment. They make no argument that if the limit here applies to the emergency allotment, as opposed to the temporary food needs, that they can satisfy the statutory text, that their position is consistent with the statutory text. So it's dependent on reading that as only applying to the temporary food needs. And the first point I was making, Your Honor, is that that's a very strange reading of this, notwithstanding the last antecedent or reasonable referent rule. Chief Judge Thomas makes what we think is an unassailable point that you should read the phrase emergency allotment addressing temporary food needs as a unitary phrase and concept because they don't operate independently. This isn't a list, which is the normal context in which you would apply these rules. And the concept that Congress would impose a statutory cap on a family's temporary food needs is bizarre. What Congress is imposing a limit on is the amount of the new benefit. And so if you don't get to temporary food needs and instead apply the cap to... Oh, I'm sorry. If you apply it to emergency allotment as we think it is best read, required to be read, then that's it for the government. So even if you get past that and you apply it to temporary food needs, which is, again, itself a very strange reading, you have to then contort yourself into thinking temporary food needs does not refer to the needs that arise during this temporary period of the pandemic. You have to think of it in terms of all food needs. And so their interpretation... Oh, I'm sorry, Judge Cross. Congress doesn't just that. It's making a statutory cap on temporary food needs in the form of the 52 clause. It's set by statute a certain formula that functions as a statutory cap. It's a statutory cap on the monthly allotment. And here the statutory cap is on the emergency allotment. My point is, as a matter of grammar and statutory construction, you don't normally read Congress as imposing a statutory cap on people's or families' food needs. It's a cap on the amount of money. But even if you get there, you still have to construe the term temporary food needs. The Ninth Circuit, for example, the panel majority, made this point. They said ultimately those references to these grammatical rules don't answer the key statutory question. The key question is, did Congress cap the total SNAP benefits at the maximum monthly allotment or did it create a separate additional benefit also tied to the monthly allotment? And so you have to then determine what does temporary food needs mean under the government's position? And there's two ways in which they distort that meaning. The first is by saying it refers to all food needs during the period of the pandemic. And I'll come back to that in a moment, but that effectively reads the word temporary out of the statute altogether. And the second thing they say is that temporary food needs has to be read as only food needs that are caused as a result of lost income. And neither one of those is a permissible reading of the phrase temporary food needs. Let me start with why it renders the word temporary superfluous. 2302 already provides for the temporal criteria for how or when the benefit is available. It is only available during a period of declared emergency at both the federal and state level, and it's only available when the state could actually come forward with actual data to support the request. So why shouldn't we put that language in the title of the section, in the text of the statute itself? It has to be a declaration of emergency. So why shouldn't we read emergency allotment simply to be referring to during that period where there's a declaration of emergency? It's an adjective related to allotment. And allotment doesn't have the same meaning in that same context. Well, to be clear, the term is emergency allotment, which is distinct from the normal monthly maximum allotment. Those are different statutory terms. The term emergency is simply descriptive. It is during the period where there is a declaration of emergency. The declaration is described both in the title and the text of the security section. Right. Your Honor, the point I'm making is that if you adopt the government's interpretation, what you end up with is you end up with exactly the same statute as if Congress provided an emergency allotment to address food needs, without the word temporary, food needs not greater than the applicable monthly allotment. Their reading effectively renders the term temporary superfluous because in this context, because the timeline for when it's available is already set by these other criteria, the term temporary is most naturally read to mean nonordinary or pandemic related. So the temporary food needs are the food needs that arise as a result of this pandemic. That's the natural reading of temporary food needs here. And it's certainly not limited to only loss of income. I'd like to make this other point, Your Honor, that ties in with the points you made earlier, the question you asked with regard to the 7 U.S.C. 2014 H3. And I think this is a really important point as well because this is the only other place in the federal code where Congress uses the term emergency allotments in connection with the SNAP program. That's in H3A. And it is true that that is a benefit that's being provided to address the loss of food during a disaster. But Congress calls it an emergency allotment and it sets the statutory limit, the maximum, for that benefit as not greater than the applicable maximum monthly allotment for the household size, the exact same limit that's in place here. And it's undisputed that when Congress used that language in 2014 H3A, it was not referring to a limit. It wasn't setting a limit on the combined amount of all benefits. It was setting a limit only on the amount of the new benefit and that the new benefit, the new emergency allotment was in addition to and on top of what was otherwise the ordinary allotment. And then it's also important to note that the very next section of 2014 H3, which is H3B, is the provision that has almost the identical language with regard to the flexibility in the reporting and processing component that we have in 23A2. And there, there's no possible argument. I'm sorry, Judge Cross, I'm having a hard time hearing you, so if I'm stepping on your question it's only because I'm not hearing you. Please. Apologies for the slow technology. So, looking at H1A, and I understand that you're pointing out that some additional cash would be needed, but the actual benefit that's involved, why is that, even under H1A, because it's tied to the safety food plan and can't exceed the amount of the safety food plan in terms of the usable food actually allocated for that family. Why shouldn't we think of H1A as actually supporting USDA assistance? And it maintains that the benefit is fixed because it's a benefit that is tied to the purchasing power for the maximum under the safety food plan. Well, I'm not sure that's right, Your Honor. And I think the reason it doesn't support the government and it does support our position is because the emergency allotment is a separate benefit that's on top of and in addition to the amount of the normal allotment, and it is capped at the amount of the normal allotment, but that cap is not to the combined amount of normal and emergency benefit. It's only for the emergency amount. Let me try to address the statutory question with a hypothetical. Imagine that you had the exact same statute, but Congress set the amount of the new benefit at 75% of the normal maximum monthly allotment. There would still be a reference to the normal maximum monthly allotment, but there would be no argument that you could make that by setting the cap in reference to that, as opposed to merely a cap, a limit on the new benefit it's providing. There would be no argument that it excludes 40% of SNAP households that were already receiving the normal monthly maximum, and there would be no argument that temporary food needs can only be experienced by people that had some income leading into the pandemic. All of the government's arguments, and we submit that they end up at the end of the day being a house of cards. All of them turn on the happenstance that Congress set the amount of the statutory maximum here. Excuse me. Congress set the limit on the new benefit at the same level as the normal monthly allotment. It did the same thing in H3A, but the benefit operates separate and in addition to and is not constrained in terms of the combined amount with the normal allotment. And then we think H3B makes clear that you can't infer from that flexibility some desire to limit temporary food needs solely to the loss of income, since it comes in a section here, 3B, that is dealing only with the loss of food. It's not dealing with income at all. And by borrowing that language and putting it into 23A2, Congress could not be trying to limit the ordinary meaning of temporary food needs. So we think it's clear, again, as Chief Justice Thomas says, it is incongruous is the term he used to think Congress was imposing a statutory cap on something that's never mentioned in the statute, namely the sum of the amount of the ordinary benefit and the new benefit. We think that by borrowing language, the Ninth Circuit majority and the government likes to use the DSNAP program and the unpublished informal guidance that they provided in terms of benefits in connection with DSNAP, none of which is a legitimate way to interpret the statute. But they ignore the actual statutory terms from 7 U.S.C. 2014 H3 that Congress is clearly borrowing here. And it does not function in the way the government says. It is not limited merely to the loss of income. Let's just look at it in the real world. In the real world, you may have gotten a subsidy, and it was destroyed, completely destroyed. And so, therefore, 2014 H3 would say, look, we're going to replenish it. And, yes, that may go beyond the maximum because you've already gotten something, but everything's been destroyed. We're going to get you back to where you were. That's a different concept than what we have here. And back to the point that I made before, or at least asked about before, you've got something done in March. You have three consistent guidances put out by USDA. Eight months later, Congress enacts another bill. And going back to my time on the Hill, there would be people lobbying. They would say, wait a minute, wait a minute. They got it wrong, USDA. You've got to make sure that this emergency is deemed to be separate from the normal monthly maximum allotment. And that didn't happen. All they did was increase the maximum monthly allotment by 15%. That's the concern that I have. You don't have, it's not legislative history so much as it's post legislation legislation. Yes, and I think it is a very dangerous basis for interpreting this with respect. It does not support the proposition that your honor is postulating. Because Congress appropriated a very large amount of money for SNAP programs. And it didn't do anything one way or the other. You had a district court decision at the time that was going one way that said, we think incorrectly in terms of statutory construction, that the government's interpretation was reasonable. And you had the decision in our case where a court had said that it was impermissible as a matter of law. There's no reason for Congress to step in and redefine the benefit. It provided the benefit, and it provided it separate. And the fight here is about what the words and the context and structure of this act mean at the time it was enacted. And not trying to infer some ratification by Congress that's not supported by case law. I propose Judge Ando's question. In the stimulus bill itself, it talks about that 15% increase applying only if the value of the benefits would be greater under that calculation than in the absence of the subsection. Can you tell us your understanding of that provision? Is that something that is relevant to the case? I do think it is relevant in that it reflects that Congress was aware that there might be expenditures that would go far beyond what would otherwise be within the agency's budgets and the like. I think, again, keep in mind this is a general appropriations. This isn't an appropriation that's focused just on the SNAP program. It's not revising any substantive legal programs that already exist. It's an omnibus appropriations bill. I think that's one of the reasons not to imbue it with the kind of meaning you were thinking, Judge Ambrose. What it does show is that Congress is paying attention and is appropriating substantial additional sums of money. There's no reason to think they won't to address the SNAP needs that arise as a result of the pandemic and otherwise. The fact that Congress increased the monthly allotment on a nationwide, across-the-board basis doesn't change the fact that law still requires 2302, which is still in force, requires the Secretary to provide a different benefit, an emergency benefit that is tied not to the factors that went into the family thrifty food plan but to the data that a state shows about its temporary food needs. And temporary food needs here clearly goes beyond loss of income. 2302C makes that clear by reference to food security. In order for the government to prevail, it has to convince you that Congress was setting a cap on a family's temporary food needs, that Congress was setting a cap on the combined amount, the sum of normal benefits and the new emergency benefit, when the statute itself makes no reference to a family's normal benefit. And it has to convince you that Congress wanted to exclude 40% of SNAP households that already were receiving the monthly maximum, even though it is undisputed that those families are experiencing severe additional temporary food needs as a result of the pandemic. And you have to conclude that temporary food needs is merely lost income, even though there's no reference to lost income anywhere in the statute, and you simply cannot construe a broad concept like food needs or temporary food needs as being tied solely to lost income. These are all reasons why their interpretation of the statute is impermissible. There is, without a doubt, the position you're taking has great empathy from a host of people across the spectrum in this country, but we have a statute. And assuming that we find that this particular statute is ambiguous, isn't the agency's interpretation of it done so consistently post the Families First Act entitled to substantial weight under Skidmore? Absolutely not, Your Honor. There are a host of reasons why it's not, but a couple that I would really highlight is that it ignores the real-world data and effects of the pandemic, which is what Congress directed that the emergency allotments must be based on. It ignores that this is intended to be a state variable benefit that is in addition to and on top of the normal monthly allotment. It functions differently. It's driven by state-by-state data. It's not an across-the-board benefit. And my colleague on the other side was complaining about that fact, but that is what the statute does. And it is arbitrary and capricious to conclude that Congress intended to exclude the poorest SNAP households, 40% in Pennsylvania, from the emergency benefit when it is not contested. If you look at footnote 11 in the government's brief, they outright concede that these poorest SNAP households are among the hardest hit by the pandemic in terms of temporary food needs and food costs. And there is simply no basis to conclude Congress was doing that. Nothing in the statute supports that. And the mere fact that they set the limit on the new benefit at the same amount of the monthly maximum as opposed to a percentage of it, higher or lower, or imagine if they did it at a fixed dollar amount, let's say $250 a month. There wouldn't be any argument that temporary food needs meant only income. There wouldn't be any argument that Congress was excluding the poorest households. The fact that Congress set the amount at the same amount for the normal monthly allotment, which is what they did in 2014 H3A as well, doesn't change the structure of the act, doesn't change the fact that it is only a limit on the new benefit. That is the only way to read that statute. And Chief Judge Thomas is right about that. The panel majority is wrong. This court should not repeat that error. But the point is you've got three really good judges on the Ninth Circuit, two of which are taking a position different from the third. And that would seem to indicate that this particular statute is not as well-crafted as one might hope and as such is ambiguous. Well, again, I'm not sure that it follows that just because, you know, some judges get the statute wrong, the statute is automatically ambiguous. And the Ninth Circuit, I know this is perhaps a little predictive, the Ninth Circuit may not be done with this process. By the time all is said and done, it may very well be established law on the Ninth Circuit that this statute is unambiguous. I think this court has to look at the language and make its own judgment and not rely on the fact that some judges reached a different conclusion. I think you have to look at the text, you have to look at the structure, you have to look at the purposes of 2302, you have to look at how it functions differently than the ordinary allotment under the Thrifty Food Plan, that it's not a nationwide one-size-fits-all amount of money that it's intended to vary from state to state. They have no answer as to why it is that Congress made this turn on a showing of state-by-state data that has to be renewed on a monthly basis and updated if it was intended to be a nationwide across-the-board thing that only true-ups. They're relying on a very odd application of the last antecedent rule. They're relying on a distorted concept of temporary food needs that renders the word temporary superfluous. They're relying on a reading of temporary food needs that makes it only turn on lost income. None of this is supported by the statutory text, by the structure, or by the real-world effects of the pandemic that Congress was intending to address here. There's no doubt that the text, reading the text literally, the government would say hyper-literally, it can be helpful to your side. But there's also another way to read it. And you're saying that the government's interpretation, you're telling us to apply it's arbitrary and capricious, but don't you normally apply that framework when an agency is engaging in policymaking through a notice and comment rulemaking, which is obviously not the case here. So is it really correct to say from an administrative law perspective that there is, in this case, that the government's interpretation is arbitrary and capricious? Well, I think it highlights why it's not entitled to any weight under Skidmore, because it leads to outcomes that Congress did not and could not possibly have intended in terms of excluding up to 40% or more of the poorest and hardest hit families in terms of temporary food needs, with no indication in the text that's what they intended to do. And so there are a lot of reasons why we think no deference is warranted here. I would note that the Ninth Circuit provided no deference whatsoever. The Ninth Circuit interpreted the statute and gave its best reading of the statute. I would urge this court to do the same. Counsel, I think maybe Judge Amber was, and if I'm wrong, you can let me know. I think what Judge Amber was asking is, you're asking us to put this in the arbitrary and capricious bucket. I believe his honor was asking you saying like that usually would apply if we were like adjudicating, whether a regulation subject to notice and comment was arbitrary and capricious. I think that's probably in the wrong bucket. Oh, I'm sorry. Let me be clear. Should we be in the contrary to law bucket as opposed to the arbitrary and capricious bucket? Because this is a notice of comment guidance. Yeah, absolutely. There's no Chevron available here. You're not within the Chevron framework as the Ninth Circuit said, Brooke, because this is the level. Counsel, I'm not asking you about deference. What I'm asking is Judge Amber was taking us out of deference into the APA. He was asking you, why are you talking about arbitrary and capricious when that usually applies to when we're adjudicating something that was subject to notice and comment? I believe if I've got him correctly, he's saying that's kind of the wrong bucket to be in if we're anywhere. And we're not in that deference plan from your point of view, are you saying the guidance is contrary to law because it is inconsistent with what you have argued to be an unambiguous statute? Well, that is, that is certainly our lead argument, your honor, that, that their interpretation is contrary to the plain terms and structure of the act and is therefore unlawful. Even if the court were to conclude that there is some ambiguity and some room to question the interpretation of the statute here, I'm making the additional point that their interpretation and the outcomes that it yields, take it outside the realm of reasonableness and is not entitled to any deference under Skidmore under Chevron under anything. And instead is an impermissible reading of the statute. You are speaking to your mandatory injunction. Yes. And, and so you would agree that that then raises the burden on, on you as to the showing you need to make it less than success. Well, actually I think this, this court's precedents make clear that the, the context of a mandatory injunction may bring an additional burden of showing the immediacy for the relief by showing increased irreparable harm. But I'm not aware of any precedent under both Bennington and Sharon. Oh, I think that's right. Yeah. It does not increase the standard that we have to show for likelihood of success. But in any event, we think we get well over any hurdle for that. One other point I'd make just about the reasonableness of the government's position is they, they get, they have to convince you to think the statute is only about the loss of income. And then they provide an approach that actually does not deliver in terms of addressing the issue of loss of income. 70% of snap households nationwide have no earned income to the extent there's income. It's from public sources that are unaffected by the pandemic. They're just applying. They want an easy to administer across the board national standard that just falls right into the thrifty food plan and doesn't vary state by state based on the showing of data. And that's not what Congress did here. And you cannot interpret the statute as just being another application of the thrifty food plan. It is designed differently and it's intentional that it turns on a state showing of actual data on an ongoing month to month basis so that there is flexible additional benefit on top of the normal allotment that can address the temporary food needs in real time based on that data. That's what Congress did here. It was not just sleepwalking through the normal thrifty food plan process. And that's what the government is, is fighting against and it's fundamentally inconsistent with the statutory scheme. Just to close your honor, I would, I would just urge the court to hold that section 2302 does exactly what it says it does. It creates a new additional emergency benefit that is on top of the normal snap allotment. That new benefit is supposed to be based on state by state showings of temporary food needs supported by actual data. As it was, as it has been done here, Pennsylvania here has, it's data shows that all snap households, including the poorest that already received the maximum allotment under normal times are experiencing severe increases in temporary food needs caused by the pandemic. That is not disputed. They have approved the, the state's showing in terms of adequate data that, and, and showing that that, that adequate data supports a benefit to all households, including, including the poorest it's, it's merely their erroneous interpretation that imposes an across the board restriction on eligibility. It is nowhere in the statute. The district court rightly concluded that Congress did not exclude the poorest snap households from emergency allotments and its preliminary injunction against USDA is unlawful and harmful interpretation should be affirmed. All right. Thank you very much. I appreciate it. And we'll go to Mr. Handle. Okay. Can you hear me? Your honor? Yeah, I think I was. All right. Just three quick points that my friend on the other side may, but I'd like to respond to in rebuttal. So first of all, just very briefly with respect to judge Ambrose, your question about redress ability. My friend cited several statements from Pennsylvania state officials to  support the idea that plaintiffs had established for address ability here respectfully USDA would submit that actions speak louder than words. Pennsylvania has not dispersed any additional allotments in response to the preliminary injunction. As I believe my friend pointed out in their brief in this court. And so we are now kind of in the worst of all possible worlds where USDA has set aside almost half a billion dollars that is not available to the agency to dedicate to any sort of regular or emergency or disaster snap allotments because it's been your marketing compliance with the preliminary injunction for Pennsylvania, but Pennsylvania is also sitting on those allotments. And so plaintiffs and other members of plaintiffs putative class are not seeing any sort of remediation of the irreparable injuries that they've inserted. Second, I think I, I believe my friend said that it would be bizarre for Congress to have written a statute that purports to apply a quantitative limit to needs that are experienced by, by households. I, I think, you know, if that is a bizarre choice, it's a bizarre choice that Congress has made numerous times throughout the statutory framework underlying the snap program. Congress, in fact, routinely equates real world needs with their statutory remedies in seven USDA section 2012, you Congress directly equates the cost of the diet required to feed a family with uniform allotments for households in section 2027B. Congress caps the requirements of states for snap benefits at the appropriation for that fiscal year. So again, it's, there's nothing unusual about Congress capping kind of a real world need with its statutory remedy. And if Congress had intended to write the statute that plaintiffs have posited to this court, there's a very easy way for Congress to have done. So it could have simply put the limiting phrase, not greater than the applicable maximum monthly allotment directly after emergency allotments in section 2302A1. And the fact that Congress opted against that formulation and instead appended that limiting phrase to temporary food needs should carry some weight in this court's textual analysis. And then finally, I think kind of the, the grovel man of plaintiff's argument as my friend mentioned today is that they read temporary food needs under section 2302A1 as a separate standalone allotment that needs to be driven by factors aside from the, the two factors, household size and household income that undergird regular snap allotments. And, and these new temporary food needs needs to be driven entirely by brand new factors, brand new determination supported by monthly state data. And I just think there's good reason to be skeptical of, of reading this provision as carving out a standalone benefits pool that is entirely untethered from Congress's assessment of monthly household food needs. And that good reason is that it's, it's a, it's a member of the household income. Going back to the question that, that this court asked, why, why then doesn't 23A2 do all of that work already? But what additional purpose then would A1 serve if the eligibility criteria so easily waived when it comes to income? Well, your honor, I think as the ninth circuit pointed out in hall, these provisions actually work together. So A2 suspends the informational requirements that are imposed on state administering agencies and that state administering agencies then in turn impose on SNAP beneficiary households. And those informational requirements go to exactly what we're talking about, including principally income and you know, sudden diminutions in household income. And so looking at, you know, section subsection A1 and subsection A2 of section 2302 in harmony, you have a world where in light of disruptions to the normal functioning of state benefit agencies, Congress recognized that USDA would likely lack access to key information affecting households entitlements to SNAP benefits, including sudden changes in income as the result of pandemic related shutdowns. And as a result, it provided a mechanism whereby USDA could quickly address diminished household income or diminished household food budgets up to the full cost of the thrifty food plan without concern to the standard 30% net income offset. So I think as the hall court decided that this USDA's interpretation actually harmonizes those two subsections into a harmonious regulatory scheme. How do you respond to your adversary's point? You made it in his papers as well, that 40% of the beneficiaries under the program would not be eligible for an additional amount. Why would Congress under ignore those who are in the most vulnerable? Sure. So, um, uh, you know, I, I think, um, the, I think it's important to kind of put ourselves back in the headspace that Congress was in, in March of 2020, right at the, the outside of this pandemic. And, um, I, I think it's, it's clear from the kind of general tenor of the legislation and also from the surrounding provisions in the bill that the families first act was not primarily a poverty relief bill. Um, it was designed instead to maintain to the extent possible the status quo of household financial resources while we paused the economy to grapple with the pandemic. So where are you at council? Where did you get that? You obviously are reading it and I have a problem with that. Where is that from? Um, this is from my notes, your honor,  it's a reasonable. Oh, that point, you know, look, trying to find some preparatory language to the bill or something in the signing statement, something, um, that theme, I didn't see anywhere. Is there anywhere in the legislation or things that would surround the legislation that could inform us? That was the goal. I'm with you on what was happening on March 18th when the bill was actually passed. We all know where we were on March 12th and 13th. Right. So I understand that, but where, where can we glean from the statute that this is part of that? That was the goal. Sure. So I will absolutely acknowledge that there is not the kind of robust legislative history that, that attaches to the family's first act or the cares act that we would love to have for other legislation of this scope. And that's entirely attributable to the fact that these were bills that were cobbled together, you know, sometimes overnight. I mean, this was an emergency that Congress was responding to. I think that it's reasonable to look at the surrounding provisions of the family's first act. So, um, not just 2302 a one, but also section 2301, which is, um, looking at jobless workers, right. This is concerned with waivers for the newly unemployed. I mean, that, that is clearly focused on people who are suffering immediate, um, economic effects from the pause that we are imposing on the economy in order to grapple with the pandemic. I think you can look at section 2302, a two, which deals with, you know, income reporting and verification requirements. So, uh, again, I, I grant that, um, you know, I, I don't have like, uh, uh, a wonderful committee report that I can point to you saying, this is exactly what we were doing, but I think that there are reasonable inferences to draw from the and then, you know, Okay. Um, right. So, so judge cross, I, I think that the, the heavy burden, so look at everybody, I think acknowledges that a mandatory, um, injunction against the government that disturbs the status quo is a disfavored remedy and that plaintiffs or movements have to establish a standard in order to show that it's justified. Um, there is, uh, kind of competing dicta, I think in, in the case law about whether that heavy burden applies, um, kind of uniformly to all the factors or applies only to the equitable factors. Um, I think there's also a question under this court, um, sliding scale approach, whether putting your thumb on any one part of the scale necessarily, um, it communicates a, a hidden burden as to all parts of the scale. I guess I would just say, um, I think that, you know, no matter how you conceive of that plaintiffs have failed to meet their burden. I think there's also kind of the separate burden here where, um, this court's case law says that, um, you have to be convinced there is a compelling basis to create a circuit split. Um, and that, that is especially true when, um, or that that reluctance to create a circuit split is especially acute where the rules that issue are best applied uniformly. Um, and here obviously USDA's position is that Congress has intended snap to be a uniform nationwide federal benefits program. Your decision to, um, affirm the district court's preliminary injunction would necessarily now create a circuit split with the ninth circuit. So I think even kind of setting aside the, um, the various precedents about where the heavy burden applies with respect to justifying a mandatory injunction, there is this separate, uh, thumb on the scale that needs to come into consideration. And then just, just finally in the, um, Can I just pick up on that for a second? Absolutely. I mean, you try to read the statute the best you can and reasonable people can differ. And if they do on circuits, there are circuit splits, but in connection with this case, you've got, yes, you've got pronouncements of the USDA shortly after the March enactment of 2302, but they're conclusory. There's no rationale that's given. Why wasn't there some reasoning given as to why you came out believing that you, no matter what happens, you can't get more than the applicable monthly maximum allotment. Um, well, your honor, I, I think, um, with respect to at least the very first guidance document, um, I mean, this was issued, uh, you know, I think within 48 hours or so USDA was, um, under a little bit of a five alarm fire here and we were doing our best to that. That's March 20th. But you also have April 11th and right after that. So you got some time to come up with some reasoning and I couldn't find any reasoning. And also it's at the very outset, Hey, look, gang, this, this isn't in any way, uh, a pronouncement of law or, or telling you any, it's, it's just how we, how we look at it. And this is our conclusion, but I, it would, it would have helped if there was some reasoning. Sure. And, and again, um, I, I believe, um, plaintiffs actually cited, uh, a guidance, a public guidance document, not one that was issued directly to state agencies, but a public Q and a document where USDA went into a little bit more detail explaining its reasoning here. And it's specifically cited, um, the example of supplemental allotments that are used to top off snap participating households in disaster settings and said that, you know, we view this as an instructive example for how Congress is intending us to respond. And, and that's basically the, the rationale here. I mean, it is essentially just, um, you have this agency that has broad experience, um, implementing snap as Congress has designed it as a uniform allotment based on the thrifty food plan. And, um, you know, it has some experience in implementing that statutory framework in urgent circumstances. And that's Your honor. I don't know that we can really read that much into it. I, I think it is instructive that Congress, um, in terms of explaining what it was doing, it used the term temporary food needs, which is, um, the, the term that is used in the, um, in the, the emergency authorization, um, for disaster snap and supplemental snap allotments. Um, you know, again, I, um, uh, I would probably have written this statute somewhat differently, um, more clearly either for us or for, we all, we all say that one. Right. Um, but, but, you know, I, I think, uh, approaching this holistically as we do for statutory interpretation, understanding kind of the, the background statutory framework and what Congress was legislating against. Um, I think it's, it's certainly reasonable. And, and as the hall court found in the ninth circuit, the best reading is USDA approach. And I just, um, if I can have, um, just another minute, I'd like to respond to one other point that, um, my friend made, which was, um, with respect to, you know, this idea that, um, uh, USDA should be treating this as a standalone, um, separate benefit that is driven by data and factors entirely separate from those informing normal snap benefits. And I think that, um, one reason to be skeptical of that reading of this statute is just the, the huge degree of legislative delegation to the agency that that reading would entail. If plaintiffs are correct, then that means that Congress has created essentially a twin snap program or a, a clone snap program that can be every bit as massive as regular snap allotments. But instead of providing the precise, um, inputs for the benefit benefit formula, as Congress did in, um, in the food and nutrition act with respect to regular allotments here, plaintiffs contend that Congress gave USDA essentially carte blanche to define what kinds of market pressures and community difficulties qualify as temporary food needs. Um, so USDA would have to decide whether certain price increases qualify, um, certain, uh, you know, food, uh, food pantry closures and things like that. And, um, I think it's untenable to read this statutory provision as, um, kind of dumping that much discretion over potentially tens of billions of dollars into the, uh,  to determine what kind of market pressures and community difficulties in USDA is lap without providing any exemplary factors without providing any contours for how that discretion would be administered. You know, even in section a two, which deals with the comparatively modest, um, issue of logistical adjustments in terms of, uh, uh,   discretion would be exercised by USDA, one in terms of what could qualify as temporary food needs. And so, uh, again, I think it just, um, it beggars belief to think that Congress would, um, would essentially double snaps, uh, you know, financial exposure and create this twin snap program entirely untethered from the thrifty food plan, um, without at least providing USDA some guidance in terms of what temporary food needs should qualify for that program. Unless there are further questions, I respectfully request that you vacate the preliminary injunction. Thank you. Thank you. Thank you to both council for extremely well presented arguments, not just arguments, but the briefing that was done. Mr. Salmon's that did you and your firm take this matter on pro bono? Yes, we had your honor. Well, thank you. You we owe you a debt of gratitude. Really, really well done throughout from you and your colleagues at Morgan Lewis. Uh, very well done. Uh, and very well done also Mr. Handle on your side as well. Uh, I would ask that a transcript be prepared to this oral argument. And I would ask if the government would pick up the cost for that, if you would, please. Absolutely. And.